IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,159

STATE OF KANSAS,
*Appellee*,

v.

ANDRE CLARK RHOINEY JR.,
*Appellant*.

SYLLABUS BY THE COURT

K.S.A. 2020 Supp. 21-6820(e)(3) does not require an appellate court to review an identical offense argument for the first time on appeal.

Appeal from Shawnee District Court; DAVID B. DEBENHAM, judge. Opinion filed December 30, 2021. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Michael J. Duenes*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Andre Clark Rhoiney Jr. directly appeals his convictions for felony murder, criminal discharge of a firearm at an occupied vehicle, and aggravated assault. We find no reversible error and affirm his convictions.

1

On a Friday night in October 2016, Rhoiney was going with his friend, Daniel Askew, to a house party in Topeka hosted by Michael Bueno. Askew rode on his motorcycle while Rhoiney followed behind him driving his baby blue Ford Expedition. On the way, Askew "warm[ed] up" his tires by swerving within his lane. Then, a minivan driven by Richea McCain pulled up alongside Askew's motorcycle and Michael Stadler—the minivan's passenger—told Askew to drive more carefully.

An argument commenced between Stadler and Askew. It continued for several blocks as the two vehicles drove next to each other. During the argument, Rhoiney continued to follow both vehicles. Eventually McCain broke off the engagement with Askew and turned left onto 29th Street. At that point, Rhoiney also turned left onto 29th Street, drove up beside McCain and fired his handgun into the van. McCain ducked and continued driving. As she heard another gunshot, Stadler cried out, "Oh, I've been hit. I've been hit. . . . In my chest."

McCain immediately drove Stadler to a nearby hospital where he was pronounced dead. Stadler had two gunshot wounds—one to his right arm and one to the right side of his chest. He was shot from an intermediate distance, and an autopsy recovered a bullet from Stadler's left chest cavity.

After the shooting, Rhoiney and Askew continued on to Bueno's house. The pair arrived shortly after midnight. Several partygoers noticed Askew's and Rhoiney's vehicles in Bueno's driveway, later identifying Askew's "crotch-rocket" style motorcycle and Rhoiney's "sky-blue" Ford Expedition SUV. During the party, Rhoiney asked Askew to "trade" handguns with him.

The next day, Bueno read an article about a shooting that occurred near his house the prior evening. The article described the incident as involving "an orange crotch rocket and a blue truck" and occurring around 12:15 a.m. Given these "coincidences," Bueno contacted the police.

One week later, Rhoiney's SUV was found on fire and hidden in the trees on an I-70 access road. A Topeka Fire Department fire investigator discovered two liquid "trailers" made from gasoline near the SUV, suggesting someone intentionally set fire to the SUV, leaving a "burned-out shell of a vehicle." The burned vehicle no longer had a license plate or a dashboard VIN number tag, yet investigators were able to recreate the VIN which matched a 2000 Ford Expedition registered to a woman with whom Rhoiney had fathered a child. Additionally, though the vehicle suffered heavy fire damage, a small patch of "baby-blue" paint remained.

A few days after that, authorities arrested Rhoiney aboard a Greyhound bus in Bluefield, West Virginia. Rhoiney initially gave the police a false name and identification card, and the police discovered a pistol hidden near Rhoiney's seat.

The State charged Rhoiney with felony murder, criminal discharge of a firearm at an occupied dwelling or vehicle, and aggravated assault. A jury trial commenced and Rhoiney was convicted of criminal discharge of a firearm at a vehicle and aggravated assault, but the jury remained deadlocked on the felony-murder charge. The district court accepted the two guilty verdicts and declared a mistrial as to the felony-murder charge.

A second jury trial followed on the remaining felony-murder charge. At the second trial, several Shawnee County Jail inmates testified about Rhoiney's conduct after his first trial, describing Rhoiney as "cavalier" about his case and that he discussed it openly regularly. The second jury convicted Rhoiney of felony murder.

3

The district court imposed a hard 25 sentence for the felony-murder conviction, 71 months for the criminal discharge of a firearm conviction, and 13 months for the aggravated assault conviction. The district court ordered the felony murder and criminal discharge of a firearm sentences to be served concurrently and the aggravated assault sentence to be served consecutively to the hard 25 sentence. Rhoiney directly appeals.

DISCUSSION

On appeal, Rhoiney raises five claims of error across both trials. First, he argues the district court erroneously instructed his second jury on felony murder because the instruction impermissibly permitted the jury to convict him under "any mental state." Second, he asserts that prosecutorial error in both trials deprived him of his right to a fair trial. Third, he argues that the district court erred in both trials by failing to instruct the jury on the lesser included offense of discharge of a firearm from a roadway. Fourth, he contends that he should have been sentenced for the lesser offense of reckless voluntary manslaughter. Fifth, he argues that cumulative error denied him a fair trial. Finding no reversible error, we affirm Rhoiney's convictions.

*Mental State Instruction*

Rhoiney's first claim of error—raised for the first time on appeal—alleges that the district court improperly instructed the jury on felony murder. He explains that he was charged with felony murder for conduct performed "in the commission of a reckless discharge of a firearm at an occupied vehicle." Thus, according to Rhoiney, he was on notice that the State was alleging a reckless state of mind, but was not on notice that he could be convicted by the "broader" states of mind of either intentional or knowing conduct. Thus, his argument goes, the district court improperly broadened the complaint

in violation of Rhoiney's due process rights when the court instructed the second jury that if the State proved Rhoiney acted "intentionally or knowingly" then the State had necessarily proved he acted recklessly.

Though Rhoiney attempts to style his challenge as a jury instruction error, his argument is rooted in a due process challenge, as his counsel made clear during oral argument. Accordingly, because Rhoiney did not raise this argument at the district court, he cannot raise it on appeal unless an exception applies. Our recognized exceptions include (1) the new claim raises only a question of law based on uncontested facts; (2) consideration is necessary to serve the ends of justice or prevent denial of fundamental rights; or (3) the district court's judgment is correct for the wrong reason. *State v. Arnett*, 314 Kan. 183, 185, 496 P.3d 928 (2021). Even so, a "decision to review an unpreserved claim under an exception is a prudential one." 314 Kan. at 248. Even if an exception may apply, we are under no obligation to review the claim. 314 Kan. at 248.

Rhoiney declares, without elaboration, that his case fits within the first two exceptions. However, Rhoiney does not explain why these exceptions are applicable to his case. And we do not find an exception under these facts because under Kansas law, "[i]f recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally." K.S.A. 2020 Supp. 21-5202(c). Further discussion of Rhoiney's argument is not "necessary to serve the ends of justice." 314 Kan. at 185.

*Prosecutorial Error*

Rhoiney claims issue with three statements made by the prosecutor at his trials. We utilize our familiar two-step process of error and prejudice to evaluate claims of prosecutorial error:

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

First, during the State's closing argument in the first trial, defense counsel objected to the prosecutor's statement:

"Counsel makes much ado over the fact that, my goodness, we didn't recover the murder weapon. Well, you know what? If that's the litmus test, you know, for determining whether or not the State can be successful in proving a case, do you realize what the import of that would be? Individuals—"

The district court sustained Rhoiney's prompt objection, finding the statement improperly appealed to the passions of the community. The court then directed the jury to disregard the statement.

We consider the ameliorating effect of a jury admonition in determining whether prejudice existed. *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015). Further, we presume jurors follow instructions provided by the district court. *Miller v. State*, 298 Kan. 921, 937, 318 P.3d 155 (2014). Rhoiney fails to demonstrate any resulting prejudice or

6

establish that the jury failed to follow instructions. We find that the district court's admonition cured any error.

The second instance of alleged error arises from the following statements made by the prosecutor during the second trial:

> "There's no evidence in this case that indicates that Mr. Rhoiney did not have a valid ID. The evidence was when he was arrested in West Virginia, the ID that he gave to the law enforcement officer was not his identification. There's simply no evidence. It's entirely possible that Mr. Rhoiney had a valid Driver's License, but the ID he chose to give to the officer in West Virginia didn't have his picture, didn't have his name, and that's consistent with him knowing he murdered somebody, and he wants to hide out."

Rhoiney claims the comments about the ID constituted impermissible speculation. We disagree. We find that the prosecutor's statement was fair commentary based on the evidence which showed: (1) Rhoiney wanted to swap pistols with Askew; (2) Rhoiney's SUV was intentionally set on fire directly before Rhoiney was discovered on a Greyhound bus in West Virginia; (3) police discovered a pistol hidden near Rhoiney when they arrested him; and (4) Rhoiney intentionally provided false identification to the arresting officer. The prosecutor's comment simply explained that these events together were consistent with someone who was fleeing a potential murder charge. This comment was not error.

Rhoiney's final instance of alleged prosecutorial error arises from the following statements made by the prosecutor during the second trial:

> "Now, one thing to keep in mind is there is some discussion by the Defense about, well, it was Mr. Askew who was getting into this argument, so he had the motivation to want to kill Mr. Stadler. That's beside the point for one reason, but the other thing is that doesn't necessary indicate why someone would have a motivation to kill

7

someone. I mean, *there are road rage incidents all over America all of the time*. They don't all end in murder, but the more important point here is that when it comes to the crime and the defendant's liability for this crime, the State is not required to prove intent, and *the State is not required to prove motive*.

"This could be an accidental shooting. As a matter of fact, Mr. Askew's testimony was shortly after the shooting, Mr. Rhoiney said to him that he fired a couple of shots to scare [Stadler], and that might have been exactly what it was. It could've been that Mr. Rhoiney saw this argument going on, and wanting to be a good friend to help out, maybe he was upset or offended by the way Mr. Stadler was acting, he just fired a couple shots at the vehicle, and the idea being that this will settle him down. This will show him, right—without any intent to kill anybody, without any intent to hurt anybody. But if in fact, it is the case that he was committing the crime of criminal discharge of a firearm at a motor vehicle at the time that happened, and the bullets he fired into that car ended up killing Michael Stadler, under the law of the State of Kansas, he is guilty of felony murder, because he would have killed Michael Stadler while he was committing the other crime." (Emphases added.)

Rhoiney objects to these statements, arguing that this passage was not a "summary of the evidence, but a disclaimer to excuse the lack of evidence." He frames these statements as an acknowledgement by the prosecutor that Askew had motive to kill Stadler. He further believes the road rage reference was "intended to inflame the passions or prejudices of the jury" and to divert the jurors' attention.

Again, we disagree. The contested statements did not fall outside of the wide latitude afforded to prosecutors. The prosecutor's statements were a fair commentary on the evidence and a proper legal explanation of what evidence was relevant to the elements of the charged crime of felony murder.

8

*Lesser Included Offense Instruction*

Next, Rhoiney argues the district court in both trials should have provided a lesser included offense instruction of discharge of firearm from a roadway. See K.S.A. 2020 Supp. 21-6308(a)(3)(B).

We apply our four-step process to analyzing jury instruction issues: (1) reviewability; (2) legal appropriateness; (3) factual appropriateness; and (4) harmlessness. *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012). When—as here—a defendant does not object to a district court's jury instructions, we apply K.S.A. 2020 Supp. 22-3414(3)'s clear error standard. Under the clear error standard, we will reverse only if we are firmly convinced the jury would have reached a different verdict if the instruction error had not occurred. *State v. Timley*, 311 Kan. 944, 955, 469 P.3d 54 (2020). The defendant bears the burden to establish reversibility, and we review the entire record de novo in determining whether he has met that burden. 311 Kan. at 955.

As to Rhoiney's first trial, we agree that a discharge of a firearm from a roadway instruction is legally appropriate as a lesser included offense of discharge of a firearm at a vehicle. See *State v. Jefferson*, 297 Kan. 1151, 1170, 310 P.3d 331 (2013). We need not discuss whether the proposed lesser included offense was factually appropriate, however, because even assuming the district court should have given the instruction, Rhoiney cannot establish reversible error.

The physical evidence and testimony clearly established Rhoiney fired at McCain's minivan while driving next to her on 29th Street. In addition to McCain's testimony that Rhoiney fired directly at her van, investigators found glass matching McCain's minivan window and two 9-mm shell casings on 29th Street. Bullet fragments were embedded in the van seats and the van dashboard, and pieces of a projectile were

9

found on the van's floorboard with a defect from passing through an object—like the minivan door. Stadler received two gunshot wounds and was shot from an intermediate distance. What is more, Askew testified Rhoiney told him Stadler "was talking some more stuff" so he "fired two warning shots *at him* to scare him." (Emphasis added.) Askew also told police that Rhoiney told him Stadler "kept talking shit, so he fired a couple shots."

Given this overwhelming evidence, we are not persuaded that the jury would have reached a different verdict if the lesser included instruction had been given. Any potential error in refusing to give the instruction was harmless.

As to the second trial, Rhoiney was only charged with felony murder. "[F]elony murder has no lesser included offenses." *State v. Gentry*, 310 Kan. 715, 730-31, 449 P.3d 429 (2019). As such, it was not error at the second trial for the district court to fail to give any lesser included instructions to the jury.

*Identical Offense Claim*

The jury convicted Rhoiney of felony murder with the underlying crime of criminal discharge of a firearm at an occupied vehicle. On appeal, Rhoiney argues that the elements of reckless involuntary manslaughter are elementally identical to reckless felony murder, and therefore under the identical offense sentencing doctrine, he must be sentenced with the penalties for the lower severity crime.

Rhoiney admits he failed to raise this claim below. He urges us to review his claim, however, arguing that K.S.A. 2020 Supp. 21-6820(e)(3)—an "appellate court may review a claim that . . . the sentencing court erred in ranking the crime severity level of the current crime"—absolves him of any duty to preserve the issue below. Additionally,

10

he makes the more traditional argument that an exception to our preservation requirements exists because his challenge is purely a legal issue. See *Arnett*, 314 Kan. at 185.

We recently rejected the argument that K.S.A. 2020 Supp. 21-6820(e)(3) requires an appellate court to review an identical offense argument for the first time on appeal. See *State v. Buck-Schrag*, 312 Kan. 540, 554-55, 477 P.3d 1013 (2020); *State v. Gray*, 311 Kan. 164, 170-71, 459 P.3d 165 (2020). Following in the very fresh footsteps of *Buck-Schrag* and *Gray*, we find that Rhoiney's identical offense claim is unpreserved and we decline to address it. Moreover, we are not persuaded to exercise our discretion to hear Rhoiney's claim for the first time on appeal by invoking one of our more traditional exceptions to preservation rules. See 311 Kan. at 170.

*Cumulative Error*

We use a de novo standard of review when determining whether "'the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial.'" *State v. Ross*, 310 Kan. 216, 227, 445 P.3d 726 (2019). "Although errors may be individually harmless, their collective effect '"may be so great as to require reversal of a defendant's conviction."'" 310 Kan. at 227. In assessing the collective effect, we consider "'how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence.'" *State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019) (quoting *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 [2014]). There is no prejudicial effect "'if the evidence is overwhelming against the defendant.'" 310 Kan. at 346.

11

Here, we found that the State committed prosecutorial error in the first trial when it improperly appealed to the passions of the community. Yet we held that the district court's prompt instruction to disregard cured this error. We also assumed without deciding error in the district court's failure in the first trial to instruct the jury on the lesser included offense of criminal discharge from a roadway. But we concluded that this assumed error was harmless beyond reasonable doubt. As we recently stated in *State v. Owens*, 314 Kan. 210, 242, 496 P.3d 902 (2021), "[t]he presumed error and harmless prosecutorial error affected separate and distinct subject matter and issues. The errors were not interrelated in a way that enhanced their prejudicial force. In other words, the cumulative impact of the errors is no greater than the sum of their individual parts."

Moreover, the evidence against Rhoiney was overwhelming. The jury heard testimony from McCain and Askew detailing Rhoiney's involvement in the shooting. The State provided additional corroborating physical evidence recovered from the scene of the shooting, as well as evidence of Rhoiney's actions following the shooting, including the intentional burning of his SUV, his desire to swap pistols with Askew, his flight to West Virginia, and his attempt to evade detection by providing a false ID.

Considering the minor impact of the unrelated errors, paired with the strong evidence presented by the State, we find that the cumulative effect of the errors was harmless.

Affirmed.